127 A.2d 476 (1956)
HENLOPEN ACRES, Inc., a corporation of the State of Delaware, Plaintiff,
v.
Sheldon F. POTTER, Defendant.
Court of Chancery of Delaware, Sussex.
December 13, 1956.
*477 James M. Tunnell, Jr. (of Tunnell & Tunnell), Georgetown, for plaintiff.
Houston Wilson, Georgetown, for defendant.
SEITZ, Chancellor.
This is an action by a maintenance corporation to enforce by foreclosure a so-called lien for annual maintenance charges as provided by deed. The basic issue presented is the legality of an increase in the so-called maintenance assessments on the lot holders.
Plaintiff corporation admittedly is responsible for the management and maintenance of Henlopen Acres, a seashore development commenced in 1930. In 1947, defendant purchased for $1,700 a lot in the development. His deed thereto recited that the land conveyed was subject to "all the conditions, covenants, agreements, assessments, reservations, restrictions and charges set forth in the deed to Wilbur S. Corkran from Henlopen Acres, Inc., dated July 22, 1930 * * *" (hereafter called the "Corkran deed").
At the purchase date the pertinent portion of the first and second paragraphs of Article IX of the Corkran deed provided:
"Each and every lot in Henlopen Acres shall be subject to an annual maintenance charge or assessment, to be levied by the party of the first part, its successors or assigns * * * in each and every year hereafter, which assessment or charge as to lots theretofore sold and conveyed by the party of the second part, or his successors in interest and title, to others * * * shall not exceed, on any lot, one per cent (1%) of the sale price by the party of the second part, or his successors in interest and title, to such lot owner; and as to all lots then owned by the party of the second part, or his successors in interest and title, shall not exceed one per cent (1%) of the pro rata acreage cost paid by the party *478 of the second part for all the William A. B. Dodd, et al., lands as conveyed unto the party of the second part herein and his wife by deed of record * *.
"The party of the second part, and his successors in interest and title, [embraces defendant] and each lot owner, shall pay such charges or assessments annually to the party of the first part, [plaintiff] its successors or assigns, in advance, on the first Monday of July in each and every year, after the year 1930, at which time the said charges or assessments shall, without notice to the owner, be due and become a lien (and so continue until paid) upon each respective lot, and in default of payment of such charges or assessments at the time specified, the party of the first part, its successors or assigns, may institute suits or prosecute proceedings in law or in equity as may be necessary to enforce said lien and the payment thereof, with interest at six per cent annum, from such due date. Furthermore, in default of such payment, the owner of such lot shall pay the additional sum of Fifty Dollars ($50.00) as liquidated damages. * * *"
Other pertinent provisions of Article IX provided:
"* * * All charges or assessments, after becoming due, shall until paid remain a lien upon the land in any event, no matter by whom the land is owned. * * *"
"The party of the first part, its successors or assigns, may adjust the annual charge or assessment herein provided, not however above the maximum hereinbefore provided for, at such times and from time to time as, in the opinion of the party of the first part, its successors or assigns, the needs of Henlopen Acres may permit."
Article VI of the Corkran deed contained a method for modifying the covenants thereof:
"Any or all of the conditions, covenants, agreements, reservations, restrictions, and charges, created and established in this deed (except as contained in Articles I and II), [not relevant] may be waived, abandoned, terminated, modified, altered, changed, or added to, as to any lands in Henlopen Acres, at any time owned by the party of the second part, his heirs and assigns, and, with the consent of the then owner or owners, as to any other lands in Henlopen Acres, provided such change can be made without the objections of the owners of more than one-half in area of all lands in Henlopen Acres, signed by the lot owners so objecting, as being prejudicial to the use of their property. Such objections shall be made in writing within thirty days after the mailing of notice of such proposed changes to all Henlopen Acres land owners by the party of the first part, its successors and assigns. No such changes shall become effective until an instrument of writing setting forth such changes in detail, executed by both parties to this deed, or their respective heirs or successors, shall be recorded in the office of the Recorder of Deeds, in and for Sussex County aforesaid. The party of the second part, and his heirs, shall be deemed owner as to any of the land in Henlopen Acres, the record title of which is standing in his or their names at that time, in determining whether the owners of more than one-half in area of the land in Henlopen Acres object to such change. * * *"
Article X dealt with the duration of the restrictions and modifications, etc., in the following language:
"All the restrictions, conditions, covenants, and agreements contained in this deed (except as set forth in Article I which shall be and is hereby made perpetual, whether Article I be in its present form or altered as permitted *479 in Article VI) shall continue in force until the First day of July, A.D. One Thousand Nine Hundred and Fifty (1950) and shall, as then in force, be continued automatically and without further notice from that time for a period of twenty years, and thereafter for successive periods of twenty years, without limitation, unless, within the six months prior to the First day of July, One Thousand Nine Hundred and Fifty (1950), or within the six months prior to the expiration of any successive twenty-year period thereafter, a written agreement executed by the then record owners of more than one-half in area of all Henlopen Acres lots, be placed on record in the office of the Recorder of Deeds, in and for Sussex County aforesaid, by the terms of which agreement any of said conditions, restrictions, covenants, liens, or charges are changed, modified, or extinguished, in whole or in part, as to all or any part of the property originally subject thereto, in the manner and to the extent therein provided. In the event that any such written agreement of change or modification be duly executed and recorded, the original conditions, restrictions, covenants, liens, and charges as therein and thereby modified, shall continue in force for successive periods of twenty years each, unless and until further changed, modified, or extinguished in the manner herein provided."
In 1947, pursuant to the provisions of Article VI, plaintiff mailed notices containing a proposal to amend Article IX by increasing the maximum assessment or maintenance charge therein provided from 1% to 2%. Objections were received from 32% of the total lot owners who held 11½% of the total number of lots owned by individuals in Henlopen Acres. In 1948, notices were mailed to each lot owner announcing that the proposed amendment would become effective commencing with the 1948 assessments. A written instrument was executed between the plaintiff and Corkran whereby the maximum assessment was raised from 1% to 2%.
Thereafter, some question having been raised concerning the validity of the 1948 assessment, the plaintiff submitted the proposed amendment, now pursuant to Article X, to a vote of the lot owners in Henlopen Acres. This vote was taken in 1950 and a majority of lot owners, both in number and area, voted in favor of the amendment. An agreement was thereupon executed by lot holders owning more than one-half of Henlopen Acres which substituted 2% for the 1% appearing in Article IX.
Pursuant to the amendments of 1948 and 1950, the plaintiff made an annual maintenance charge against all lots in Henlopen Acres, in each of the years from 1948-55 inclusive at the rate of 2%. The defendant was billed at the rate of 2%. However, he paid only 1% in 1948 and 1949. His 1950 payment at 1% was refused and since that time he has paid nothing.
Plaintiff has moved for a summary judgment and defendant has moved to dismiss the complaint. Both sides concede that no material fact is in dispute and that this court has jurisdiction. It may also be noted that defendant's counsel did not attack either in his brief or at oral argument the regularity of the procedure followed in connection with either the 1948 or the 1950 attempts to increase the assessment. It will therefore be assumed that both actions meet the formal requirements of the respective Articles.
The court emphasizes that it is ruling only upon the points raised by defendant's counsel at oral argument or in his brief. They may be summarized as follows:
(1) A private corporation cannot levy a local or special assessment without legislative consent, for such is in realty a tax.

*480 (2) The provisions of the contract are oppressive.
(3) When a restrictive covenant provides for a maximum fixed rate of assessment, such rate cannot be increased under a general power to amend.
(4) When a restrictive covenant fixes the period within which it is to be of full force and effect, it may not be amended prior to the expiration of that period under a general power to amend.
(5) To the extent plaintiff's claim exceeds charges for three years it is barred by laches.
Let us first consider defendant's contention that the maintenance charge or assessment is in realty a tax, and any attempt by a private corporation to levy and collect it is an unconstitutional exercise of the taxing power. It should be noted, parenthetically, that in making this contention defendant is thereby also attacking the original provision calling for an assessment at 1%; even though he paid it for several years. But let us consider the merits of his argument.
It seems clear that a true maintenance assessment is not invalid as a tax. It is not assessed by public authority. It is merely a covenant running with the land or, as called by some courts, an equitable servitude. Similar maintenance assessments have been declared valid in several jurisdictions. See Rodruck v. Sand Point Maintenance Commission, Wash., 295 P. 2d 714; Phillips v. Smith, 240 Iowa 863, 38 N.W.2d 87; University Gardens Property Owners Ass'n v. University Gardens Corp., Sup., 88 N.Y.S.2d 734; Neponsit Property Owners Ass'n Inc., v. Emigrant Industrial Savings Bank, 278 N.Y. 248, 15 N.E.2d 793, 118 A.L.R. 973; Id., 278 N. Y. 704, 16 N.E.2d 852, 118 A.L.R. 982. This type of assessment seems admirably calculated to assist in the proper maintenance of development such as that here involved. Moreover, prospective purchasers in this development were on notice as to these covenants and if they disliked them they were under no obligation to purchase.
I conclude that the so-called assessment is not invalid as a tax.
Nor is it unconstitutional to make these maintenance assessments a lien or charge on the property upon which they are assessed. Each owner is aware that he is obligated to pay this assessment at a particular time. Moreover, a method is provided for ascertaining whether such assessments have been paid. Under these circumstances due process does not require that notice be given before such a charge becomes a lien. I need not consider whether such charges would have priority as against "outside" claimants.
Defendant next argues that the assessment provisions are oppressive because the assessment upon the substantial amount of property held by plaintiff is substantially lower than that of other owners including defendant. This follows, says defendant, from the provision of Article IX which provides for the use of the "sale price" as the assessment base for lots sold by the developer in contrast to "the pro rata acreage cost to the developer" as the assessment base for land held by plaintiff. Since, says defendant, the sale price to defendant and others is substantially higher than the equivalent pro rata acreage cost of land still held by plaintiff, the result is that defendant and others pay a grossly disproportionate share of the total charges. Defendant contends that the result is oppressive and the charges should therefore not be enforced by a Court of Equity.
It will be noted that under this point defendant attacks the right to make any charge under the present procedure for determining the assessment. Once again, I pass over this apparent delay in asserting this defense. I also pass over the fact *481 that, while argued, this contention was not briefed. I shall further assume the doubtful premise that the record shows that the particular assessments are in fact disproportionate.
Does the fact that plaintiff's land is subject to a lower assessment than defendant's render the charge illegal? Ordinarily, in the field of public taxation, in the absence of a reasonable basis for different classifications, the use of more than one assessment base would render taxes based thereon invalid. But we are here dealing with a matter of private contract. These covenants are a matter of public record and defendant is charged with knowledge of them. Moreover, it must be assumed in the absence of a showing to the contrary that the classification of the developer's land at pro-rated original cost is reasonable. No attempt is made to make a contrary showing in the record. It is presumably undeveloped land which might not receive the same degree of benefit as that accorded the developed areas.
I conclude that the record fails to support the contention that the assessment provisions are oppressive in law.
Defendant's third contention is that since Article IX provides for a maximum fixed rate of assessment, such rate cannot be increased under a general power to amend.
As I understand defendant's argument, he says that although Article VI provides a general power to amend the covenants involved, it does not apply to the 1% ceiling on assessments set forth in Article IX because to so apply it would mean that a general power to amend could be used to change a specific provision in a set of restrictions. Defendant relies upon the established principle that covenants are not to be enlarged by implication and are to be strictly construed.
Leaving aside the fact that there is a provision in the final paragraph of Article XIII which states that the covenants and restrictions may be extended by implication, it is clear that defendant's argument in effect asks the Court to ignore the language of the instrument. There is no reason why the provisions of Article VI specifically dealing with amendments should be any less applicable to Article IX than to other specific provisions of the instrument. An even more powerful argument against defendant's position is the fact that Article VI expressly recites that the amendatory power refers to the "conditions", "agreements", and "charges" created and established in the deed except as contained in Article I and II (not here relevant). If the draftsman of the instrument had not intended Article VI to apply to Article IX there is no reason why he could not have made an exception, as he did with Articles I and II. Moreover, there is no reason in public policy or otherwise to hold that the amendatory provision should be strictly construed under the circumstances. Unlike restrictions themselves, it is primarily for the benefit of the land owners and is presumably a device to enable a majority to exercise some control over such covenants.
Defendant suggests there is a sound reason for holding that the rate of assessment may not be increased. It is based on an argument that 51% of the lot owners might increase the assessment to any amount and thereby expropriate the property of the 49% who did not go along with them. This argument has at least two answers: first, it cannot be assumed that the majority will vote in a way which would in effect expropriate the interest of the minority since basically, in this situation, their interests are the same; second, defendant purchased his land with knowledge of this provision.
I conclude that there is no merit to defendant's argument that because Article VI is only a general power to amend it may not be employed to amend the assessment rate fixed in Article IX.
*482 Defendant's next contention is that when a restrictive covenant fixes the period within which it is to be of full force and effect, it may not be amended prior to the expiration of that period under a general power to amend.
Under this contention defendant points out that Article X provides that the restrictions, etc., were to continue in force until July 1, 1950 and should continue thereafter for successive periods of twenty years unless changed or amended by the owners of more than one-half in area of the lots by action taken within six months of the termination of any such twenty year period. He next points out that under Article VI, restrictions could be amended if the change could be made without the objections of the owners of more than one-half in area of all the lands in Henlopen Acres. The defendant argues that these two Articles are contradictory because under Article X the amendment could only be by the owners of more than one-half in area of the Henlopen Acres' "lots" while under Article VI it could be done if there was no objection by the owners of more than one-half in area of "all lands" in Henlopen Acres. From the foregoing facts defendant concludes that the two Articles are contradictory because they provide different procedures for amending the restrictions.
The fact of the matter is that Article VI is a general power to amend at any time while Article X deals with a very limited period when amendments are possible. Article VI deals with amendments of subsisting restrictions, conditions, etc., whereas, Article X provides a procedure whereby such restrictions, agreements, etc., may be altered for purposes of fixing the covenants which are to be binding for a further twenty year period. Thus, the two Articles are not contradictory because Article VI deals with amendments which can be made effective at any time while Article X deals, inter alia, with amendments which can only be effected if action it taken at a specific time and even then the action does not become effective until the commencement of the next twenty year period.
Defendant also argues under this point that under the language of Article VI plaintiff could vote the land constituting the beds of the road and other reserved land. I have serious doubt that Article VI is fairly susceptible of the construction that lands constituting the beds of the streets could be recognized in connection with action under Article VI. But assuming without deciding that it could, I cannot see how this makes Article VI inconsistent with Article X. Rather, it would suggest that different requirements are imposed depending upon which Article is invoked. I merely note that the majority may change the provision if appropriate action is taken within six months prior to the commencement of the next twenty year period. This is apart from Article VI.
Since I cannot conclude that Article VI and Article X are contradictory and repugnant it follows that I see no merit to defendant's argument that any attempt to invoke Article VI is void and unenforceable for that reason.
It follows from my conclusion on this point that plaintiff's amendment in 1948 was not ineffective for any of the reasons advanced by defendant. But, defendant claims that plaintiff's claim is barred by laches to the extent it exceeds three years' charges.
Plaintiff bases its claim to collect the increased assessment from its inception in 1948 on the provision of Article IX to the effect that "* * * All charges or assessments, after becoming due, shall until paid remain a lien upon the land in any event * * *". Defendant argues that since plaintiff could have sued at law it is therefore barred by laches from collecting more than three years' charges, citing 10 Del.C. § 8106, statute of limitations. It will be seen from this argument *483 that defendant ignores the quoted provision of Article IX which in effect purports to make the claim a binding lien against the land until paid.
The parties have in effect provided by contract for a continuing lien until payment is made. Defendant does not suggest that they may not provide by contract for a lien. Nor did defendant brief any contention which would require the court to pass upon the validity of this provision. Its validity is therefore assumed. Limiting myself to the arguments advanced by defendant, I conclude that the statute of limitations is not a defense to any part of plaintiff's claim.
To summarize, I conclude that the amendment adopted in 1948 changing the rate of assessment provided by Article IX is not invalid for any reason asserted by defendant. Under the circumstances therefore it must be assumed to be lawful. In view of my conclusion I need not pass upon the validity of the action taken under Article X in 1950.
The plaintiff is entitled to be declared to have a valid lien on defendant's property to the extent of the unpaid charges, with interest thereon at 6%. I see no occasion to allow liquidated damages on the present record. If the lien recognized in the judgment to be entered hereon is not discharged within ten days after the entry of the judgment, plaintiff may apply for further relief. A provision to this effect may be inserted in the judgment.
Plaintiff's motion for summary judgment is granted and defendant's motion to dismiss is denied.
Order on notice.