# Westmoreland Association, Inc., Respondent, v West Cutter Estates, Ltd., et al., Appellants.

Second Department, January 13, 1992

APPEARANCES OF COUNSEL

*Munley, Meade, Burns & Nielsen, P. C. (Lawrence C. Re* of counsel), for appellants.

*Kathleen M. Beckett* for respondent.

### OPINION OF THE COURT

KUNZEMAN, J. P.

■■ This appeal presents a situation in which a homeowners' association seeks to enjoin the defendants from completing construction of three single-family homes on the ground that the construction violates a restrictive covenant requiring that dwellings be set back a minimum of 20 feet from the front line of the property. This restriction applied to virtually every similarly situated residential lot in the area on the border of Queens and Nassau Counties known as Westmoreland. There is no dispute that the houses in question were subject to the restrictive covenant and that they were being built at a distance of 15 feet from the front lines of the respective lots. The threshold issue is whether the plaintiff Westmoreland Association, Inc. (hereinafter the Westmoreland Association), has standing to bring such an action to enforce a restrictive covenant which runs with the land. We find that the Westmoreland Association has the requisite standing and, furthermore, contrary to the defendants' contentions, that the injunction enforcing the restrictive covenant

was properly granted. At the outset, a review of the underlying facts, which are essentially uncontroverted, is in order.

The Westmoreland area is subject to a set of private restrictive covenants commonly known as the Rickert-Finlay agreements. The area contains approximately 320 building lots on which predominantly one-family houses have been erected. This property was, at one time, owned by a common grantor, the Rickert-Finlay Realty Company, which filed a map of the area in Queens County on or about May 17, 1907. As part of the scheme or plan in accordance with which Westmoreland was developed, the common grantor imposed certain restrictions on the lots therein. The covenants containing these restrictions appeared in the defendants' chain of title in a deed dated July 30, 1924, from Rickert Holding Corp. to Stiles Realty Corp. The defendants were, therefore, on notice of their existence.

The defendant West Cutter Estates, Ltd. (hereinafter West Cutter) is a builder and developer which owns six contiguous lots shown on the 1907 map as lots numbered 56 through 61, inclusive. These lots form three double-lot building sites known as 250-34, 250-38, and 250-42 41st Drive in Little Neck, respectively. West Cutter took title in December 1986. The defendant Joseph Allegretta is the principal of West Cutter.

The Westmoreland Association was first formed in 1917 and was incorporated in 1924. Its bylaws provide that membership in the association "shall be limited to residents or property owners of the development known as Westmoreland, situated in the Counties of Queens and Nassau, Long Island, New York, who shall automatically become members of the Association by virtue of such residence or ownership therein". The bylaws further provide for annual dues of $5, payable by April 1st of each year. Among the particular objectives for which the association was organized, as set forth in its certificate of incorporation, is to "take all lawful action to maintain and enforce covenants and restrictions of record relating to the use of land and buildings within said Westmoreland".

Among the restrictive covenants, which appear in the defendants' chain of title, is the following: "Ninth. No building shall be erected nearer than twenty feet to the front line of any lot, except in the business sections. Porches, piazzas, porte-cocheres are excepted from this restriction".

A building permit was granted to the defendants by the New York City Department of Buildings on or about May 13,

1987, enabling them to construct a house on each of their three building sites. The plans showed front-line setbacks for each house of only 15 feet. The defendants' construction of the houses on the property in question in violation of the restrictive covenant requiring a front-line setback of 20 feet prompted the association's litigation for permanent injunctive relief. As set forth in the complaint, the restrictive covenants, including that pertaining to the front-line setback, were imposed in furtherance of a general plan to preserve the tract for restricted residential use. The defendants refused to abide by applicable restrictions, notwithstanding a demand for compliance by the Westmoreland Association. Construction was halted by order of the Supreme Court, Queens County, dated July 23, 1987, upon the application of the association. As a result, the three houses now stand in a skeletal or incomplete state.

The defendants contend, on appeal, that the Westmoreland Association had no standing to commence this action. They assert that the trial court's reliance on *Matter of Douglaston Civic Assn. v Galvin* (36 NY2d 1) is misplaced inasmuch as that case involved a proceeding pursuant to CPLR article 78, brought by residents and a civic association, to challenge the granting of a variance. The Court of Appeals therein classified the petitioner, a civic association of over 1,000 owners and residents in the immediate vicinity of the area involved in the grant of the variance, as an aggrieved person within the meaning of Administrative Code of the City of New York former § 668e-1.0 (a) (currently § 25-207 [a]). On that basis, it had standing to challenge a determination of the Board of Standards and Appeals. In the course of its opinion, the Court of Appeals specifically recognized the particular need in zoning cases for a broader rule of standing, given the financial inequities between developers and individual property owners.

To the contrary, the instant case does not involve a proceeding pursuant to CPLR article 78 concerning public zoning ordinances but, rather, an equitable action concerning private restrictive covenants. The question for resolution thus becomes whether the *Douglaston* holding should be applied to cases, such as the instant one, which involve restrictive covenants. A brief historical overview is appropriate at this juncture.

The traditional rule is that, irrespective of the intention of the parties, a covenant will run with the land and will be enforceable against a subsequent purchaser of the land at the

suit of one who claims the benefit of the covenant, only if the covenant complies with certain legal requirements. "The age-old essentials of a real covenant" have been set forth as follows: "(1) it must appear that grantor and grantee intended that the covenant should run with the land; (2) it must appear that the covenant is one 'touching' or 'concerning' the land with which it runs; (3) it must appear that there is 'privity of estate' between the promisee or party claiming the benefit of the covenant and the right to enforce it, and the promisor or party who rests under the burden of the covenant. (Clark on Covenants and Interests Running with Land, p. 74)" *(Neponsit Prop. Owners' Assn. v Emigrant Indus. Sav. Bank,* 278 NY 248, 254, 255, *reh denied* 278 NY 704). Under such a restrictive view, civic and property owners' associations, with no direct proprietary interest in the land, would clearly have no standing to challenge the violation of a covenant.

The willingness of courts to dispose of disputes over land use on the ground of standing, as opposed to reaching the merits, was inconsistent with broader rules of standing in related areas (Ayer, *Primitive Law of Standing in Land Use Disputes: Some Notes From a Dark Continent,* 55 Iowa L Rev 344 [1969]). There has been, in this State, a gradual movement away from technical requirements, commencing with the seminal 1938 case of *Neponsit Prop. Owners' Assn. v Emigrant Indus. Sav. Bank (supra).* There, an action was commenced to foreclose a lien upon land owned by the defendant. The lien emanated from a covenant subjecting the property to an annual charge for maintenance of " 'roads, paths, parks, beach, sewers and such other public purposes as shall from time to time be determined by the [grantor], its successors or assigns' " *(supra,* at 254). The plaintiff, a property owners' association which was contemplated in the deed, was organized to receive the sums payable by the owners and to expend them for the benefit of those owners. The realty company assigned to the plaintiff all of its right, title and interest "in and to the said annual charge or lot tax, provided for in the covenant of each deed theretofore made" by the realty company, of lots or plots out of the subject tract of land. Significantly, the corporate plaintiff had not succeeded to any of the land, nor did it have title to the streets or public places upon which the charges assigned to it were to be expended. The court did not, however, focus upon the corporate plaintiff's lack of privity of estate. Rather, the court emphasized the fact that the association had been formed as a convenient

instrument by which the property owners might advance their common interests. In the language of the court: "Only blind adherence to an ancient formula devised to meet entirely different conditions could constrain the court to hold that a corporation formed as a medium for the enjoyment of common rights of property owners owns no property which would benefit by enforcement of common rights and has no cause of action in equity to enforce the covenant upon which such common rights depend. Every reason which in other circumstances may justify the ancient formula may be urged in support of the conclusion that the formula should not be applied in this case. In substance if not in form the covenant is a restrictive covenant which touches and concerns the defendant's land, and in substance, if not in form, there is privity of estate between the plaintiff and the defendant" *(Neponsit Prop. Owners' Assn. v Emigrant Indus. Sav. Bank, supra,* at 262).

In reliance upon *Neponsit (supra),* the Appellate Division, Fourth Department, has subsequently ruled that a plaintiff association's representative status was sufficient to satisfy the requirement of privity *(Riverton Community Assn. v Myers,* 142 AD2d 984). In the *Riverton Community Assn.* case, a declaration filed in the County Clerk's office between the property owner and the association stated that the association was formed to own, develop, manage, and maintain land and facilities within the community and included a covenant obliging owners of land, within the Riverton properties, to pay assessments for common areas and services provided by the association.

Although the *Douglaston* case *(Matter of Douglaston Civic Assn. v Galvin,* 36 NY2d 1, 6-7, *supra)* involved a zoning law, the rationale of the Court of Appeals provides a strong case for further broadening the rules of standing, stating:

"It should be readily apparent that a person desiring relaxation of zoning restrictions—such as a change from residential to business—has little to lose and much to gain if he can prevail. He is not reluctant to spend money in retaining special counsel and real estate appraisers if it will bring him the desired result. The individual owner of developed land in the neighborhood, on the other hand, may not, at the time, realize the impact the proposed change of zoning will have on his property, or, realizing the effect, may not have the financial resources to effectively oppose the proposed change. Thus, the neighboring property owners rarely fight as hard for

zoning protection as the developer or speculator does for relaxation of zoning restrictions. Against this background of economic disparity, an individual property owner, who stands only to gain (or prevent the loss of) the maintenance of the *status quo* as regards the value of his homestead and his peace and quiet, cannot be expected, nor should he be required, to assume by himself the burden and expense of challenging the zoning change. Even if successful, the aggrieved individual will not be able to recoup his expenditures. By granting neighborhood and civic associations standing in such situations, the expense can be spread out over a number of property owners, putting them on an economic parity with the developer.

"This broader rule of standing is entirely consistent with the underlying purposes of our zoning laws. Our municipalities enact zoning ordinances in order to protect the public's health, welfare and safety. A challenge to a zoning variance focuses the court's attention on this public interest. To force a court to reject such a challenge on the grounds of standing when the group contesting the variance represents that segment of the public which stands to be most severely affected by it is, in our view, an ironic situation which should not be permitted to continue.

"In view of these factors, we believe that an appropriate representative association should have standing to assert rights of the individual members of the association where such persons may be affected by a rezoning, variance or an exception determination of a zoning board".

The court went on to enumerate four factors for determining whether a particular association has standing to assert the rights of its members who might be affected by the issuance of a zoning variance. These are the capacity of the organization to assume an adversarial position, whether its size and composition reflect a position fairly representative of the community or interest which it seeks to protect, the adverse effect of the decision sought to be reviewed on the group represented, and whether full participating membership is available to the residents and property owners in the neighborhood.

The requirement that an association meet these standards insures that that organization has a substantial identification with the successors in interest of the original grantor and that it will represent their collective interests. Furthermore, denial of standing might well result in an undesirable multiplicity of actions and motions.

The decision in *Douglaston (supra)* was relied upon by the County Court of Yates County in *Starkey Point Prop. Owners' Assn. v Wilson* (96 Misc 2d 377), where the deed did not specifically name the plaintiff or provide for its prospective creation. The association, nevertheless, had standing since it was found to have a substantial identification with the property owners and to be an appropriate representative of both the owners and the property to be benefited by the covenant *(see also,* 43 NY Jur 2d, Deeds, § 201, at 390-391). *Douglaston* provided a good rationale for expanding *Neponsit (supra)* to eliminate the rigid requirement of privity. *Starkey* further expanded it to include situations where the homeowners association was not established by deed.

In sum, it is reasonable to conclude that the corporate plaintiff Westmoreland Association was formed as a convenient instrument by which the property owners could advance their common interests and that it has a substantial identification with the real property owners in Westmoreland. Given all of the aforementioned factors, the Westmoreland Association qualified as a bona fide representative of the residents and property owners in the subject locale and, consequently, had standing to bring this action, irrespective of the fact that it may not have met the technical requirements of privity of estate.

We further find, contrary to the defendants' contention, that the injunction enforcing the restrictive covenant was properly granted. Considering the evidence as a whole, the plaintiff met its burden of establishing by "clear and definite proof" that the restrictive covenant was entered into with the design to carry out a general scheme for the improvement or development of Westmoreland *(Huggins v Castle Estates,* 36 NY2d 427, 432; *Graham v Beermunder,* 93 AD2d 254, 258; *see, Korn v Campbell,* 192 NY 490). Indeed, the evidence demonstrates that in 1907 the common grantor filed a subdivision map of the area *(see, Graham v Beermunder, supra).* Furthermore, virtually all of the approximately 320 homes subsequently developed within Westmoreland are subject to and comply with the restrictive covenant in question.

Considering all of the circumstances, the court correctly found that the equities balanced in favor of granting the injunction. The defendants learned, prior to closing, that at least a portion of their property was subject to the restrictive covenant in question. Despite such notice, and despite the

protests of the Westmoreland Association, they proceeded at their own risk to build the three houses in violation of the restrictive covenant. There is no indication either that the defendants acted in good faith or that the association acted with unclean hands. On the contrary, the association informed the defendants of its objection to any violation of the covenant prior to the defendants' receipt of city approval for their building plans. The wrong committed by the defendants in this case was committed with full knowledge that it was in violation of the restrictive covenant governing front-line setbacks.

Under the circumstances, the defendants' position does not appeal to the equitable conscience and the injunction was properly issued (see, Goodfarb v Freedman, 76 AD2d 565, 574).

Accordingly, the judgment appealed from is affirmed.

HARWOOD, EIBER and BALLETTA, JJ., concur.

Ordered that the judgment is affirmed, with costs.